UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CINDY IMESON,

    Plaintiff,

  v.

EAGLE VIEW TECHNOLOGIES, INC.,

    Defendant.

CASE NO. C13-468 MJP

ORDER DENYING IN PART AND
GRANTING IN PART MOTION FOR
SUMMARY JUDGMENT

This matter is before the Court on Defendant's motion for summary judgment. (Dkt. No. 19.) The Court considered the motion, Plaintiff's response (Dkt. No. 23), Defendant's reply (Dkt. No. 36), and all relevant documents. Embedded in Defendant's reply is an evidentiary objection and motion to strike. (Dkt. No. 36 at 12.) The Court GRANTS Defendant's motion to strike and Defendant's motion for summary judgment as to Plaintiff's claim for Intentional Infliction of Emotional Distress. The Court DENIES the motion for summary judgment as to all other claims.

## Background

Plaintiff Cindy Imeson began her employment with Defendant Eagle View Technologies, Inc. ("Eagle View") on September 22, 2010. (Dkt. No. 1 at 3.) Imeson began with Eagle View as

1  an Inside Sales Account Manager in the corporate office. In December of 2011, Imeson was

2  promoted to Inside Sales Senior Account Manager with an increase in her base salary. (Id.)

3  Around the same time, Patrik Parsons became an Inside Sales Manager, serving in a supervisory

4  role to Imeson. (Id. at 4.)

5         On April 14, 2012, Imeson was rushed to the emergency room because of medical

6  problems that turned into a severe infection. (Dkt. No. 1 at 4.) On April 16, Imeson informed

7  Heidi Ellsworth, Vice President of Sales and Marketing at Eagle View, of her medical problems.

8  (Id.) Ellsworth expressed concern and asked Imeson to keep her informed. (Id.) Imeson also

9  notified Parsons. (Id.) Later in April, Plaintiff was informed by Human Resources Director Dana

10  Donaly that she had used all her paid time off and would need to take Family Medical Leave

11  ("FMLA"). (Id.)

12         Plaintiff returned to work part-time beginning May 9, 2012. (Dkt. No. 1 at 5.) The

13  following week she increased her time and eventually returned to a full time schedule. (Id.)

14  While Plaintiff was on FMLA leave her largest account, Solar City, was taken from her. (Dkt.

15  No. 1 at 5.) Defendant contends the decision to remove the Solar City account was made before

16  Imeson took FMLA leave due to Imeson's previously expressed stress levels, but does not

17  dispute this planned removal was not discussed with Imeson prior to her FMLA leave. (Dkt. No.

18  19 at 10.) After a meeting set up by Ellsworth with Imeson and Parsons to discuss Imeson's

19  concerns regarding the removal of the Solar City account, the account was returned to Imeson.

20  (Dkt. No. 1 at 5.) During the meeting, Imeson states she was made to discuss her medical

21  problems in front of Parsons. (Id.)

22        Ellsworth testified Imeson's sales numbers began "downtrending" in the fall of 2011,

23  before she took FMLA leave. (Dkt. No. 22 at 91.) Ellsworth stated she spoke to Imeson about the

24

downtrending, but did not recall documenting any conversations. (Id. at 92.) Ellsworth also stated Imeson's accounts were not lower or further behind than the accounts of other employees. (Id. at 93.)  Parsons also testified he had a conversation with Imeson about downtrending accounts, but likewise did not document a meeting. (Id. at 136.) Parsons also stated there were ongoing concerns related to Imeson undermining him as a manager, but due to the "close-knit" nature of the group, all communication was verbal. (Id. at 138.) Parsons does point to an E-Mail from Ellsworth intended to document a July 26, 2012 verbal meeting with Imeson in which a verbal warning was given. (Id. at 168.)

Imeson asserts her performance level was high before and following her leave, and states she was specifically praised for outstanding performance during a performance as late as August 2012. (Dkt. No. 1 at 6.) For example, Imeson notes she was asked to travel to San Francisco to the headquarters of Solar City in April of 2012 to meet with representatives to discuss increasing the scope of the partnership between the two companies, as a result of her performance. (Id.) In both March and April of 2012 Imeson was formally recognized for outstanding sales numbers and exceeding sales goals. (Id.)

From September 3-7 of 2012, Imeson took vacation which was approved in advance by Parsons. (Dkt. No. 33 at 6.)  On September 24 and 25 of 2012, Imeson was ill and unable to go into work. (Id.) On September 24, 2012, Parsons sent an email to Donaly and Ellsworth asking to speak to them about putting Imeson on probation for attendance. (Dkt. No. 35-4 at 2.) Donaly E-Mailed Parsons on September 25, 2012, putting together an overview of Imeson's absences for the year. (Dkt. No. 35-6 at 2.) The E-Mail stated, "If the average person takes 3 weeks off per year, she is currently at 5.60 weeks. Even though her FMLA was approved, her absences are still 'excessive' when viewed with the average." (Id.) Donaly followed up with an E-Mail later that

1    day, stating "One more thing: we can't count her FMLA days for excessive absenteeism… only

2    the 7 days that she called out. When thinking about her non-FMLA sick days, is 7 days

3    considered excessive when compared to others on your team? It seems excessive when looked at

4    across the company but I want to make sure it is viewed that way per your specific team." (Id.)

5           Imeson alleges during the months following her FMLA leave Parsons "gave her a hard

6    time" about taking leave. (Dkt. No. 1 at 6.) On September 26, 2012, Imeson brought in a doctor's

7    note for two days missed for illness earlier that month. (Id.) Imeson alleges Donaly told her a

8    doctor's note was unnecessary, but Imeson told Donaly she brought the note because Parsons

9    continued to comment on her absences, including stating in front of other team members that

10   Imeson was "the sickest person [he] has ever known." (Id.) The same day, Imeson says Parsons

11   told her the two of them and Donaly were going to have a one-on-one meeting before the end of

12   the week. (Dkt. No. 33 at 7.)

13          On September 28, 2012, Imeson spoke to Donaly about her concerns related to Parsons.

14   (Dkt. No. 33 at 8.) She complained Parsons treated her negatively following her leave, and

15   expressed concerns about Parsons referring to female employees as cunts and yelling at them.

16   (Id.) Later that day, Imeson was informed she would not be meeting with Parsons at the

17   previously scheduled time because he took the day off. (Id.) Imeson E-Mailed Parsons

18   expressing her frustration about the meeting cancellation. (Id. at 9.)

19          On October 1, 2012, Parsons approached Imeson and asked if she had a few minutes,

20   taking her to meet in Donaly's office. (Dkt. No. 33 at 9.) Imeson was given a Performance

21   Improvement Plan ("PIP"). (Dkt. No. 30 at 7.) Imeson asserts she glanced at the document but

22   did not read it completely. (Id.) At the bottom of each page of the PIP, the words "Proprietary

23   and Confidential" appear.  (Dkt. No. 20 at 12-14.) Imeson expressed to Parsons and Donaly she

24

ORDER DENYING IN PART AND GRANTING IN
PART MOTION FOR SUMMARY JUDGMENT- 4

1   had a hard time respecting Parsons as a manager because he referred to women as cunts.  (Dkt.

2   No. 30 at 7.) Parsons first denied the allegation but eventually admitted he did use that language.

3   (Id.)  Imeson states at the meeting Parsons produced a calendar to show Imeson's missed days,

4   which included days she alleges she did not miss. (Id.) According to Imeson, there was no policy

5   at Eagle View about missing days and there was no set number of paid time off ("PTO") days.

6        Imeson alleges one-on-one meetings had never been confidential in the past, and after the

7   PIP meeting she showed a co-worker a note saying she believed Parsons was trying to get her

8   fired within four weeks. (Dkt. No. 30 at 8.) The same day, Imeson says another co-worker asked

9   her how the one-on-one meeting went, and Imeson stated Parsons denied his use of derogatory

10  language towards women until pressed, and that she believed Parsons would try to get her fired

11  within four weeks. (Id.) On October 3, 2012, Parsons E-Mailed Donaly informing her he was

12  approached by Imeson's co-workers and was told Imeson said she was getting fired in four

13  weeks. (Dkt. No. 20 at 18.) Donaly responded stating they had told Imeson this was "a 100%

14  private matter." (Id.) On October 5, 2012, Imeson was given a notice of immediate termination

15  citing "insubordination" and referencing her discussion of the PIP with her co-workers. (Id. at

16  20.)

17        Imeson now brings claims for interference with FMLA rights, discrimination for

18  requesting FMLA rights, retaliation under the Washington Law Against Discrimination

19  ("WLAD"), and Intentional Infliction of Emotional Distress ("IIED"). (Dkt. No. 1 at 7-8.)

20  Defendant moves for summary judgment on all claims. (Dkt. No. 19.)

21

22

23

24

**Discussion/Analysis**

I.      Standard for Summary Judgment

Summary judgment is warranted if no material issue of fact exists for trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying facts are viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).  If the moving party makes this showing, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). "A plaintiff alleging employment discrimination need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry - one that is most appropriately conducted by a factfinder, upon a full record." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2000)(internal citations omitted).

II.     Family Medical Leave Act Claims

The Family Medical Leave Act, 29 U.S.C. §2615(a), created two interrelated, substantive rights: (1) the employee has a right to use certain amounts of leave for protected reasons, and (2) the employee has a right to return to his or her job or an equivalent after using protected leave. Sanders v. City of Newport, 657 F.3d 772, 777 (9th Cir. 2011). The FMLA places an affirmative

1  burden on an employer to notify employees of their rights under the Act. Bushfield v. Donahoe,

2  912 F. Supp. 2d 944, 952 (D. Idaho 2012). Section 2615(a)(2) makes it unlawful for employers

3  to retaliate or discriminate against a person for opposing any violation of their FMLA right to

4  leave. Section 2615(a)(1) makes it unlawful for an employer to "interfere with, restrain or deny"

5  the exercise or attempt to exercise FMLA leave.

6       A.    Retaliation Claim

7       "Under §2615(a)(2), it is 'unlawful for any employer to discharge or in any other manner

8  discriminate against any individual for opposing any practice made unlawful by this subchapter."

9  Sanders, 657 F.3d at 777.  An allegation under this section is a retaliation or discrimination

10 claim. Id. In Bachelder v. Am. W. Airlines, Inc., the Ninth Circuit expressly did not decide

11 whether the burden shifting framework articulated in McDonnell Douglas v. Green, 411 U.S.

12 792 (1973), should be applied to retaliation claims under §2615(a)(2). 259 F.3d 1112, 1125, n.

13 11 (9th Cir. 2001). The Ninth Circuit acknowledges, however, most other circuits have adopted

14 some version of the McDonnell Douglas burden shifting framework.  Sanders, 657 F.3d at 777.

15 District Courts in the Ninth Circuit have used the McDonnell Douglas framework in the analysis

16 of §2615(a)(2) claims. See, Bushfield, 912 F. Supp. 2d at 953.

17      Under the McDonnell Douglas framework, a plaintiff must establish a prima facie case of

18 retaliation. Id. To establish a prima facie case of FMLA retaliation, a plaintiff must show (1) he

19 availed himself of a protected activity under the FMLA, (2) he was adversely affected by an

20 employment decision, and (3) there is a causal connection between the two actions. Washington

21 v. Fort James Operating Co., 110 F. Supp. 2d 1325, 1331 (D. Or. 2000).  If a prima facie case is

22 established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason

23 for the adverse action. Sanders, 657 F.3d at 777, n.3. If the employer articulates a legitimate

24

ORDER DENYING IN PART AND GRANTING IN
PART MOTION FOR SUMMARY JUDGMENT- 7

1   reason for its action, the burden shifts back to the plaintiff to show the reason given is pretext. Id.

2   Pretext can be proven indirectly, by showing the employer's explanation is not credible because

3   it is internally inconsistent or otherwise not believable, or directly, by showing unlawful

4   discrimination more likely motivated the employer. Id.

5           Issues of material fact preclude summary judgment on this claim.  Imeson successfully

6   makes a prima facie case of FMLA retaliation: she complained to management that her job

7   duties were altered because she took FMLA leave, and that she experienced harassment from

8   Parsons related to her FMLA leave. (Dkt. No. 33 at 20.) Imeson was later terminated from her

9   position, and claims the motive for her termination was retaliation for her complaints. (Id.)

10  Defendant articulates a legitimate reason for Imeson's termination: her breach of the PIP

11  confidentiality. (Dkt. No. 19 at 25.) Because Defendant articulates a legitimate reason for the

12  adverse action, Plaintiff must directly or indirectly show the given reason is pretext. (Id.)

13          Imeson puts forth indirect evidence of pretext substantial enough to preclude summary

14  judgment. While breach of confidentiality of the PIP is cited as a primary reason for Imeson's

15  termination, Parsons testified Imeson did not actually reveal anything told to her in confidence at

16  the PIP meeting. (Dkt. No. 35-1 at 27.) The conflicting accounts of Imeson's performance at

17  work in 2012 also create a material issue of fact. For example, Imeson's receipt of the "500k

18  club" award for exceeding sales goals in April 2012 (Dkt. No. 19 at 8) conflicts with the notion

19  Defendant was concerned about Imeson's performance as early as the beginning of 2012. (Id. at

20  12.) The evidence before the Court requires determinations of credibility, which are not

21  appropriate at the summary judgment stage. For this reason, summary judgment is DENIED.

22

23

24

B.  Interference Claim

An interference claim is based on §2615(a)(1) which states, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise" the substantive rights guaranteed by FMLA. 29 U.S.C. §2615(a)(1).  When an employee alleges she was fired for taking FMLA leave, the claim is properly analyzed under the interference prong of the FMLA statute. Xin Liu v. Amway Corp., 347 F.3d 1125, 1132 (9th Cir. 2003). The Ninth Circuit does not apply the burden shifting framework of McDonnell Douglas Corp. v. Green to interference claims. Denison v. Kaiser Found. Health Plan of the Northwest, 868 F. Supp. 2d 1065, 1080 (D. Or. 2012). To make an interference claim based on termination, a plaintiff must show "by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim . . . by using either direct or circumstantial evidence." Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001).

There are material issues of fact precluding summary judgment in favor of Defendant on this claim. The Parties do not dispute that Imeson's FMLA was properly taken; the Parties do dispute whether the FMLA leave was a negative factor in her termination or alteration of her employment responsibilities. Defendant argues the record establishes Imeson's FMLA leave was not a factor in the PIP or notice of termination, and notes the FMLA leave was not mentioned in either document. (Dkt. No. 19 at 21.) Defendant also argues the fact Imeson was terminated four and a half months after returning from FMLA leave shows a lack of connection between the leave and termination. (Id.) Defendant further contends the Solar City account was not removed due to the FMLA leave because Defendant intended to remove the account before the leave was taken. (Id.) Although Persons testified the Solar City account was going to be taken from Imeson

1   before she went on FMLA, there is no documentation to show this was the case. There is an E-

2   Mail from Parsons to Donaly sent on Friday, April 13, 2012, the day before Imeson went to the

3   emergency room, stating due to Imeson's stress level he intended to remove leadership

4   responsibilities and new customers, but the E-Mail does not mention removal of existing

5   accounts. (Dkt. No. 21 at 9.).

6       The documentation related to ongoing discussions of Imeson's leave and Imeson's

7   concerns about Parsons' treatment of her absences in the time between her return from FMLA

8   leave and her termination create issues of fact regarding the motive for her termination and

9   produce sufficient temporal proximity between the leave and termination. Defendant cites <u>Swan</u>

10  <u>v. Bank of America</u> for the proposition that four months between FMLA leave and termination

11  makes the leave too remote to establish causation. (Dkt. No. 19 at 21.) In <u>Swan</u>, however, the

12  Ninth Circuit found such a gap problematic when temporal proximity was the only connection

13  offered between the leave and the termination. 360 Fed. Appx. 903, 906 (9th Cir. 2009). Here,

14  temporal proximity is not the sole connection; Imeson offers evidence that her FMLA leave was

15  discussed and was considered an issue when she returned, such as the E-Mails from Parsons

16  regarding her absences and Parsons' comments to her about her illness. (Dkt. Nos. 35-6 at 2, and

17  35 at 4.) Whether or not the disputed facts and circumstantial evidence amount to a successful

18  FMLA interference claim is best left to the finder of fact, and summary judgment is DENIED.

19      III.    Retaliation under WLAD

20      The WLAD prohibits employers from taking adverse employment actions against an

21  employee based on protected conduct. <u>Hines v. Todd Pac. Shipyards Corp</u>., 127 Wn. App. 356,

22  374 (2005). "To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) she

23  engaged in statutorily protected activity; (2) defendants took some adverse employment action

24  against her; and (3) there is a causal connection between the protected activity and the

1   discharge." <u>Macon v. UPS</u>, U.S. Dist. LEXIS 159202, *16-17 (W.D. Wash. Nov. 5, 2012).

2   Under WLAD, it is "an unfair practice for any employer . . . to discharge  . . . or otherwise

3   discriminate against any person because he or she has opposed any practices forbidden" by the

4   WLAD.  RCW 49.60.210. The conduct complained of by the plaintiff need not actually be

5   unlawful, so long as she reasonably believed the opposed practices to be unlawful. <u>Renz v.</u>

6   <u>Spokane Eye Clinic</u>, P.S. 114 Wn. App. 611, 619 (2002). The <u>McDonnell Douglas</u> burden

7   shifting framework, discussed above, applies to claims under WLAD. <u>Id</u>. at 618-19.

8        Imeson's WLAD claim survives for the same reason the FMLA retaliation claim

9   survives. Imeson alleges she complained to Defendant about Parsons' treatment of women and

10  his comments related to her FMLA absences. (Dkt. No. 33 at 21.) Imeson was fired, which is the

11  "ultimate adverse employment action." <u>Renz</u>, 114 Wn. App. at 621. The disputed facts and

12  credibility issues surrounding the causal connection between the protected behavior and the

13  termination which precluded summary judgment on the FMLA claims also preclude summary

14  judgment here, and summary judgment on this claim is DENIED.

15      IV.     Intentional Infliction of Emotional Distress

16          An Intentional Infliction of Emotional Distress ("IIED") claim in Washington requires

17  (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress,

18  and (3) the actual result to the plaintiff of severe emotional distress. <u>Kloepfel v. Bokor</u>, 149

19  Wn.2d 192, 195-96 (2003). The conduct must be "so outrageous in character, and so extreme in

20  degree, as to go beyond all possible bounds of decency, and tend to be regarded as atrocious, and

21  utterly intolerable in civilized society." <u>Id</u>. at 196.  Although the elements of IIED are generally

22  factual questions for the jury, "a trial court faced with a summary judgment motion must first

23  determine whether reasonable minds could differ on whether the conduct was sufficiently

24  extreme to result in liability." <u>Strong v. Terrell</u>, 147 Wn. App. 376, 385 (2008).

1    Summary judgment is appropriate on this claim because the conduct alleged is not

2    sufficiently extreme to amount to the tort of IIED. The allegations made by Imeson, including

3    her termination, the alleged improper removal of the Solar City account, and the alleged

4    inappropriate comments by Parsons do not rise to the level of IIED. The fact of discharge itself,

5    on its own, is not sufficient to support an IIED claim. <u>Dicomes v. State</u>, 113 Wn.2d 612, 630

6    (1989). The manner in which a discharge is accomplished may support an IIED claim, but here

7    Imeson was discharged with a letter, in a manner not alleged to be particularly outrageous. (Dkt.

8    No. 33 at 11.) Although Parsons' use of the word cunt in the business context is boorish and

9    misogynistic, it does not rise to the level of an IIED claim, particularly where it is unclear the

10   comments were directed at Imeson. Even if all of Plaintiff's allegations were taken as true, they

11   do not amount to an IIED claim and summary judgment is GRANTED in favor of Defendant on

12   the allegation of IIED.

13       V.    Motion to Strike

14       Defendant moves to strike the statement in Plaintiff's declaration at paragraph 11 which

15   states, "While I was out on leave, Shannon Decker told me that Mr. Parsons was saying that I

16   was not coming back and he was implying to the team that perhaps I was not really sick." (Dkt.

17   No. 34 at 3.) Defendant argues this statement is hearsay and offered to prove the truth of the

18   matter asserted. (Dkt. No. 36 at 16.) Defendant argues the statement does not fall into the scope

19   of Federal Rule of Evidence 801(d)(2)(D), which states "[a] statement is not hearsay if [t]he

20   statement is offered against the party and is a statement by the party's agent or servant

21   concerning a matter within the scope of the agency or employment, made during the existence of

22   the relationship" because according to Defendant, Ms. Decker has no human resources related

23   responsibilities. (<u>Id</u>. at 16.)

24

1    The Court GRANTS the motion to strike. This statement creates two layers of alleged

2 hearsay: (1) Imeson recounting what Decker said; and (2) Decker recounting what Parsons said.

3 However, the statement is not being offered to prove the truth of what Parsons said; instead it is

4 being offered, at most, to prove the fact that he said it. Therefore, the second layer (Decker's

5 restatement of Parsons' alleged words) is not hearsay.

6    Imeson appears to be offering Decker's statements to prove Parsons made comments

7 about her while she was on FMLA leave, and therefore restates them to prove the truth of the

8 matter asserted, in which case the statement is impermissible hearsay. The Court GRANTS

9 Defendant's motion and STRIKES the statement for the purposes of summary judgment.

10 However, the Court notes the statement is not stricken in general and may be admissible at trail if

11 warranted by the circumstances and if a proper foundation is laid.

12                                        **Conclusion**

13    Issues of material fact and the need for credibility determinations preclude summary

14 judgment on all claims except the claim of IIED. Plaintiff fails to allege facts necessary to

15 support an IIED claim. Defendant's motion for summary judgment is DENIED, except it is

16 GRANTED as to Plaintiff's claim of IIED. Defendant's evidentiary motion to strike is

17 GRANTED for the purposes of summary judgment.

18

19    The clerk is ordered to provide copies of this order to all counsel.

20    Dated this 14th day of March, 2014.

21

22    _____
      Marsha J. Pechman
23    Chief United States District Judge

24

ORDER DENYING IN PART AND GRANTING IN
PART MOTION FOR SUMMARY JUDGMENT-
13